UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal Number:_____ |
| | : | |
| v. | : | VIOLATION: |
| | : | 18 U.S.C. § 371 |
| **JOHN CARLTON ALBAUGH,** | : | (Conspiracy) |
| | : | |
| **Defendant.** | : | |

## INFORMATION

The United States charges that:

## COUNT ONE

### 18 U.S.C. § 371 - Conspiracy

### INTRODUCTION

Unless specified otherwise, at all relevant times:

<u>The Defendant</u>

1. From in or about January 1993 through in or about December 2006, Defendant JOHN CARLTON ALBAUGH was employed by a Member of the United States House of Representatives ("Representative 4"). From 1993 through in or about 1995, defendant ALBAUGH served as a Staff Assistant for Representative 4. From in or about 1995 through in or about 1996, defendant ALBAUGH served as a Legislative Aide for Representative 4. From in or about 1996 through in or about 1998, defendant ALBAUGH served as a Legislative Director for Representative 4. From in or about 1998 through in or about December 2006, defendant ALBAUGH served as Chief of Staff for Representative 4.

2. From in or about January 2003 through in or about January 2005, Representative 4 served

as chairman of the U.S. House of Representatives Appropriations Committee, Subcommittee on Transportation, Treasury & Independent Agencies ("the Subcommittee").

3. As Chief of Staff for Representative 4, one of defendant ALBAUGH's primary responsibilities was to oversee issues relating to the Subcommittee, including appropriations requests. Defendant ALBAUGH also supervised the staff of Representative 4, including the individual serving as Representative 4's campaign manager.

The Lobbyists and Their Clients

4. From in or about 1993 to in or about 1997, Lobbyist C was a staff member in the office of another Member of the United States House of Representatives. From in or about 1998 to in or about 1999, Lobbyist C worked for a subcommittee of the Senate Judiciary Committee and served as executive director of a political party caucus in the United States House of Representatives.

5. In or about December 1999, Lobbyist C resigned from his position with a political party caucus of the United States House of Representatives to become a lawyer and lobbyist at a Washington, DC law and lobbying firm ("Firm A"). In or about January 2001, Lobbyist C joined another law and lobbying firm ("Firm B") as a lawyer and lobbyist.

6. Lobbyist C represented numerous clients with issues before the United States Congress and federal departments and agencies, including Native American tribes, municipalities, and corporations. Lobbyist C, Lobbyist C's supervisor, Jack Abramoff, or Firm B also controlled luxury box, floor (for basketball) and ice (for hockey) seats at the MCI Center

Arena in Washington, D.C. (now known as the Verizon Center), and luxury suites at FedEx Field in Maryland.

7. On numerous occasions from in or about March 14, 2002 to in or about May 17, 2004, defendant ALBAUGH communicated with his coconspirators, including Lobbyist C, in furtherance of the conspiracy using interstate electronic mail and interstate telephone calls.

ALBAUGH's Failure to Comply With the Rules of the House of Representatives

8. At all relevant times, the Rules of the House of Representatives (the "Rules"):

   a. prohibited gifts to Members of Congress and staff members of more than $50 at one time, and a total of $100 per year from one source, except under limited circumstances, and prohibited all gifts to Members of Congress and staff members given because of their official positions. On a number of occasions, including but not limited to those set forth below, defendant ALBAUGH accepted gifts in violation of this rule;

   b. required that an exemption be sought from the Ethics Committee to receive more than $250 worth of gifts annually from anyone considered a personal friend. Defendant ALBAUGH neither sought nor received such an exemption for gifts he received from Lobbyist C; and,

   c. required that Members of the House and staff members at or above a certain salary threshold publicly file and certify as true and accurate Annual Financial Disclosure Statements with the Clerk of the House reporting detailed financial information, including gifts of a certain minimum value received from a single

source. Defendant ALBAUGH was required to file Annual Financial Disclosure Statements.

## THE CONSPIRACY AND ITS OBJECTS

9. From in or about March 2002 to in or about May 2004, in the District of Columbia, and elsewhere, the defendant,

**JOHN CARLTON ALBAUGH,**

did knowingly conspire, confederate and agree with Lobbyist C and other persons known and unknown to the United States to commit offenses against the United States, that is, to devise a scheme and artifice to defraud and deprive the House of Representatives and the people of the United States of their right to the honest services of ALBAUGH performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment and self-dealing, and to use the interstate wires in furtherance of the conspiracy, in that ALBAUGH accepted from Lobbyist C a stream of things of value which were intended to and did induce defendant ALBAUGH to take a stream of official action to benefit Lobbyist C, Firm B, and their clients and were intended to and did reward defendant ALBAUGH for such action in violation of 18 U.S.C. §§ 1343, 1346 and 2.

## PURPOSE OF THE CONSPIRACY

10. It was a purpose of the conspiracy for defendant ALBAUGH to benefit himself and/or Representative 4 by using and agreeing to use his official position and by performing and agreeing to perform official acts in return for a stream of things of value benefitting himself and/or Representative 4.

11. It was a further purpose of the conspiracy for defendant ALBAUGH to enrich Lobbyist C

source. Defendant ALBAUGH was required to file Annual Financial Disclosure Statements.

## THE CONSPIRACY AND ITS OBJECTS

9. From in or about March 2002 to in or about May 2004, in the District of Columbia, and elsewhere, the defendant,

**JOHN CARLTON ALBAUGH,**

did knowingly conspire, confederate and agree with Lobbyist C and other persons known and unknown to the United States to commit offenses against the United States, that is, to devise a scheme and artifice to defraud and deprive the House of Representatives and the people of the United States of their right to the honest services of ALBAUGH performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment and self-dealing, and to use the interstate wires in furtherance of the conspiracy, in that ALBAUGH accepted from Lobbyist C a stream of things of value which were intended to and did induce defendant ALBAUGH to take a stream of official action to benefit Lobbyist C, Firm B, and their clients and were intended to and did reward defendant ALBAUGH for such action in violation of 18 U.S.C. §§ 1343, 1346 and 2.

## PURPOSE OF THE CONSPIRACY

10. It was a purpose of the conspiracy for defendant ALBAUGH to benefit himself and/or Representative 4 by using and agreeing to use his official position and by performing and agreeing to perform official acts in return for a stream of things of value benefitting himself and/or Representative 4.

11. It was a further purpose of the conspiracy for defendant ALBAUGH to enrich Lobbyist C

and others by providing favorable action to Lobbyist A, Firm B, and/or their clients.

12. It was a further purpose of the conspiracy to conceal from the U.S. House of Representatives, and the citizens of the United States the things of value defendant ALBAUGH received from Lobbyist C, the manner and the degree to which defendant ALBAUGH was enriched by Lobbyist C, and the ways in which defendant ALBAUGH used his official position to benefit Lobbyist C, Firm B, and their clients.

### MANNER AND MEANS

13. The conspiracy was carried out through the following manner and means:

   a. ALBAUGH solicited and accepted a stream of things of value from Lobbyist C, including meals, tickets to professional sporting events and concerts, and campaign contributions, campaign fundraising events, and undisclosed in-kind contributions benefitting Representative 4, provided by Lobbyist C, Firm B, and their lobbying clients.

   b. In exchange for this stream of things of value, ALBAUGH provided and agreed to provide a stream of favorable official action to, and to use his influence on behalf of, Lobbyist C, Firm B, and their lobbying clients.

   c. ALBAUGH further solicited and accepted certain things of value with the intent to be rewarded for and because of his official actions on behalf of Lobbyist C, Firm B, and their lobbying clients.

## OVERT ACTS

In furtherance of the conspiracy and to achieve its purpose, defendant ALBAUGH and his co-conspirators committed the following overt acts, among others, in the District of Columbia and elsewhere:

14. On or about March 14, 2002, Lobbyist C sent a series of e-mails to defendant ALBAUGH in which he communicated a client need for federal funds and told defendant ALBAUGH, "[y]ou are going to eat free off of our clients."

15. On or about January 28, 2003, shortly after learning that Representative 4 was to be named Chairman of the Transportation Appropriations Subcommittee, a fellow lobbyist at Firm B e-mailed Lobbyist C, remarking, "[t]hat's good for us!! Hello Albaugh."

16. On or about January 29, 2003, defendant ALBAUGH requested and Lobbyist C agreed that Lobbyist C and Firm B would host a $10,000 fundraising dinner for the benefit of Representative 4 the following week.

17. On or about February 4, 2003, Lobbyist C organized and hosted a fundraising dinner at Signatures restaurant for the benefit of Representative 4. The campaign committee of Representative 4 did not reimburse Lobbyist C, Firm B, or Signatures restaurant for the costs of this event, nor did it disclose such costs as an in-kind contribution in required filings with the Federal Election Commission. Defendant ALBAUGH, who solicited this fundraising dinner, never inquired as to the cost of the dinner for purposes of reimbursing Lobbyist C, Firm B, or Signatures, or for disclosing the costs as an in-kind contribution in the campaign committee's Federal Election Commission filings.

18. On or about February 4, 2003, defendant ALBAUGH solicited three tickets to a concert by

country music artist George Strait provided by Lobbyist C or Firm B.

19. On or about March 10, 2003, defendant ALBAUGH accepted a free lunch at the Capitol Hill Club provided by Lobbyist C or Firm B.

20. On or about March 19, 2003, at the suggestion of defendant ALBAUGH, Representative 4 called Jack Abramoff, thanking him in advance for use of one of his FedEx Field suites for an upcoming fundraising event. During that call, Representative 4 also asked Abramoff which particular projects Firm B's clients wanted in the transportation bill. Abramoff thereafter sent an e-mail to the lobbyists on his team telling them that Representative 4 had "basically asked what we want in the transportation bill," and instructing the lobbyists to "make sure we load up our entire Christmas list."

21. On or about April 4, 2003, defendant ALBAUGH solicited and accepted four tickets to a concert by country music artist Tim McGraw in a suite at MCI Center, two of which he used and two of which he provided to another staffer for Representative 4. The tickets were provided by Lobbyist C or Firm B.

22. On or about April 10, 2003, defendant ALBAUGH agreed with Lobbyist C to meet with him to review Firm B's clients' transportation appropriation requests.

23. On or about May 14, 2003, defendant ALBAUGH solicited and Lobbyist C agreed to provide use of the MCI Center suite controlled by Jack Abramoff or Firm B for a fundraising event benefitting Representative 4 during an upcoming American Idols concert tour event.

24. On or about May 19, 2003, at the request of Lobbyist C, defendant ALBAUGH agreed with Lobbyist C to preserve certain transportation appropriation requests benefitting various clients of Lobbyist C in a district in which the Member of Congress had announced he was retiring, despite the custom that these requests would normally have been eliminated.

25. On or about June 17, 2003, at the request of defendant ALBAUGH, Jack Abramoff provided $5,000 to satisfy the initial funding obligation of a political action committee established by Representative 4.

26. On or about July 2, 2003, Lobbyist C e-mailed defendant ALBAUGH to ask him "[w]as (sic) our other [appropriations] requests easy to find?" Defendant ALBAUGH responded, "Aren't you lucky I'm around," to which Lobbyist C responded, "[y]ou better believe it."

27. On or about July 10, 2003, defendant ALBAUGH solicited Lobbyist C to provide, and deliver, dinner to him and other staffers working late on the transportation appropriations bill.

28. On or about July 11, 2003, defendant ALBAUGH agreed to ensure that clients of Lobbyist C and Firm B received more than $4 million in a Subcommittee draft of the transportation appropriations bill.

29. On or about July 24, 2003, Lobbyist C provided and delivered lunch to defendant ALBAUGH and other members of Representative 4's staff.

30. On or about July 25, 2003, defendant ALBAUGH accepted lunch for himself and other Congressional staffers provided and delivered by Lobbyist C.

31. On or about July 28, 2003, Lobbyist C fulfilled defendant ALBAUGH's request that

Lobbyist C host a fundraising event for the benefit of Representative 4 during an American Idols concert event in an MCI Center Suite. The campaign committee of Representative 4 did not reimburse Lobbyist C or Firm B for the costs of this event, nor did the campaign committee timely disclose any such costs in required filings with the Federal Election Commission. Defendant ALBAUGH did not ask Lobbyist C for the costs of this event, in order to reimburse the owners of the suite, or report the in-kind costs on Federal Election Commission filings, until more than two years later, in reaction to press attention related to Jack Abramoff's lobbying practices.

32. On or about July 29, 2003, defendant ALBAUGH agreed with Lobbyist C to assist him with securing approximately $4.183 million in funding for a road project benefitting one of Lobbyist C's clients. Defendant ALBAUGH, Representative 4, and Lobbyist C had discussed this request the night before in an MCI Center Suite during an American Idols concert event using tickets provided by Lobbyist C or Firm B.

33. On or about August 4, 2003, defendant ALBAUGH accepted a meal provided by Lobbyist C or Firm B at Charlie Palmer's restaurant.

34. On or about September 4, 2003, at the request of defendant ALBAUGH, Lobbyist C and Firm B fulfilled their March 2003 agreement by hosting a fund raiser in a suite at FedEx Field for the benefit of Representative 4 during the season-opening football game for the Washington Redskins. The campaign committee of Representative 4 did not reimburse Lobbyist C or Firm B for the costs of this event, nor did the campaign committee timely disclose any such costs in required filings with the Federal Election Commission. Defendant ALBAUGH did not ask Lobbyist C for the costs of this fundraising event, in

order to reimburse the owner of the suite, or report the in-kind contribution in the campaign committee's FEC filings, until more than two years later, in reaction to press attention related to Jack Abramoff's lobbying practices.

35. On or about November 4, 2003, Lobbyist C e-mailed defendant ALBAUGH, telling him, "[n]ow let's get that conference done so we can bring the bucks home!!!!!" Defendant ALBAUGH responded, "I (sic) actually going thru the earmarks right now!"

36. On or about November 11, 2003, defendant ALBAUGH e-mailed Lobbyist C to tell him that, "there will be something for [Client A]. About 1 million."

37. On or about November 12, 2003, in response to an e-mail from Lobbyist C asking whether he is "still conferencing" on the transportation appropriations bill, defendant ALBAUGH then responded, "[y]es, it is helping your projects out." Lobbyist C responded, "WOO-HOO. Tell me when you can. . . thanks." Defendant ALBAUGH subsequently responded:

> "[Client A] is now at $1.25 m
>
> [Client B] $1 m
>
> [Client C] $1.2 m
>
> [Client D] $1.4 m
>
> Whos [sic] the man!"

38. On or about November 17, 2003, defendant ALBAUGH accepted lunch at Oceanaire restaurant in Washington, DC provided by Lobbyist C or Firm B.

39. On or about November 17, 2003, defendant ALBAUGH solicited four tickets to each of three upcoming events: (i) a November 20, 2003 professional horse show at Patriot Center in Fairfax, Virginia; (ii) a November 24, 2003 concert by the children's group, The

Wiggles, in a suite at MCI Center; and (iii) a December 14, 2003 Washington Redskins football game in a FedEx Field Suite. All of the tickets were provided by Lobbyist C or Firm B to defendant ALBAUGH to use personally or to benefit from by providing such tickets to another member of Representative 4's staff.

40. On or about November 24, 2003, defendant ALBAUGH accepted five tickets provided by Lobbyist C or Firm B to a November 30, 2003 Washington Redskins football game in a suite at FedEx Field.

41. On or about January 13, 2004, Lobbyist C offered to defendant ALBAUGH to organize and host another fundraising dinner for the benefit of Representative 4.

42. On or about January 22, 2004, defendant ALBAUGH solicited and accepted four tickets provided by Lobbyist C or Firm B to a performance of Disney on Ice in a suite at MCI Center, which he provided to another staffer for Representative 4.

43. On or about February 11, 2004, defendant ALBAUGH met with a municipal client of Lobbyist C regarding their transportation needs for the upcoming year.

44. On or about March 5, 2004, Lobbyist C requested and defendant ALBAUGH agreed to insert a question prepared by Lobbyist C into the written record of a Subcommittee hearing that would benefit one of Lobbyist C's clients that defendant ALBAUGH had assisted in November 2003.

45. On or about May 17, 2004, defendant ALBAUGH signed and filed a required Financial Disclosure Statement for Calendar Year 2003 with the Office of the Clerk, United States House of Representatives. ALBAUGH intentionally failed to disclose on this form that he had received certain sporting event tickets, concert tickets, and meals from Lobbyist C

which individually, and in the aggregate, exceeded the required reporting threshold.

(All in violation of Title 18, United States Code, Section 371.)

Dated: 5/30/08

WILLIAM M. WELCH II
Chief, Public Integrity Section

*[signature]*
MATTHEW L. STENNES
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice

*[signature]*
NATHANIEL B. EDMONDS
Senior Trial Attorney
Fraud Section
Criminal Division
U.S. Department of Justice