USA v. JOHN CARLTON ALBAUGH

08-157 (ESH)

ATTACHMENT A

**FILED**

FACTUAL BASIS FOR THE PLEA OF
JOHN CARLTON ALBAUGH

JUN 0 2 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Background

1.     From in or about January 1993 through in or about December 2006, Defendant JOHN

CARLTON ALBAUGH was employed by a Member of the United States House of

Representatives ("Representative 4").  From 1993 through in or about 1995, ALBAUGH

served as a Staff Assistant for Representative 4.  From in or about 1995 through in or

about 1996, ALBAUGH served as a Legislative Aide for Representative 4.  From in or

about 1996 through in or about 1998, ALBAUGH served as a Legislative Director for

Representative 4.  From in or about 1998 through in or about December 2006,

ALBAUGH served as Chief of Staff for Representative 4.

2.     From in or about January 2003 through in or about January 2005, Representative 4 served

as chairman of the U.S. House of Representatives Appropriations Committee,

Subcommittee on Transportation, Treasury & Independent Agencies ("the

Subcommittee").

3.     As Chief of Staff, one of ALBAUGH's primary responsibilities was to oversee issues

relating to the Transportation Appropriations Subcommittee, including appropriations

requests.  ALBAUGH also supervised the staff of Representative 4, including the

individual serving as Representative 4's campaign manager, who was responsible for

preparing the campaign committee's required filings with the Federal Election

Commission.

4.     From 1993 to 1997, Lobbyist C was a staff member in the office of another Member of

the United States House of Representatives.  From 1998 to 1999, Lobbyist C worked for a

subcommittee of the Senate Judiciary Committee and served as executive director of a

political party caucus in the United States House of Representatives.

5.    In December 1999, Lobbyist C resigned from his position with a political party caucus of

the United States House of Representatives to become a lawyer and lobbyist at a

Washington, DC law and lobbying firm ("Firm A").  In January 2001, Lobbyist C joined

another law and lobbying firm ("Firm B") as a lawyer and lobbyist.

6.    Lobbyist C represented numerous clients with issues before the United States Congress

and federal departments and agencies, including Native American tribes, municipalities,

and corporations.  Lobbyist C's firm or Lobbyist C's supervisor, Jack Abramoff, also

controlled luxury box, floor (for basketball) and ice (for hockey) seats at the MCI Center

Arena in Washington, D.C. (now known as the Verizon Center), and luxury suites at

FedEx Field in Maryland.

7.    ALBAUGH knew that Lobbyist C and Firm B represented numerous clients with issues

before the United States Congress.  ALBAUGH knew that Jack Abramoff or Firm B

controlled a luxury box and floor (for basketball) and ice (for hockey) seats at MCI

Center in Washington, D.C. (now known as Verizon Center), and luxury suites at FedEx

Field in Maryland.

Scheme to Defraud the House of Representatives and the Public of Albaugh's Honest Services

8.    Beginning in or about March 14, 2002 to in or about May 17, 2004, ALBAUGH joined

and participated in a conspiracy involving Lobbyist C and others, using mail and

interstate wire communications, to deprive the public of the honest services of

2

ALBAUGH. That is, ALBAUGH solicited and accepted a stream of things of value from

Lobbyist C and others with the intent to be influenced in his official actions and to agree

to take official actions at Lobbyist C's request. ALBAUGH understood Lobbyist C and

others provided the stream of things of value with the intent to influence or reward

ALBAUGH for his official actions and to deprive the House of Representatives and the

public of his honest services.

Things of Value

9.    As part of the conspiracy described in paragraph 8, the stream of things of value solicited

and accepted by ALBAUGH and paid for by Lobbyist C, his lobbying firm, and their

clients to reward and/or influence ALBAUGH to provide a stream of official action,

included, but was not limited to, the following:

a.    On or about February 4, 2003, ALBAUGH solicited three tickets to a concert by

country music artist George Strait provided by Lobbyist C or Firm B.

b.    On or about March 10, 2003, ALBAUGH accepted a free lunch at the Capitol Hill

Club provided by Lobbyist C or Firm B.

c.    On or about April 4, 2003, ALBAUGH solicited and accepted four tickets to a

concert by country music artist Tim McGraw in a suite at MCI Center, provided

by Lobbyist A or Firm B. ALBAUGH used two of the tickets and also benefitted

from providing the other two tickets to another staffer of Representative 4.

d.    On or about July 10, 2003, ALBAUGH solicited Lobbyist C or Firm B to provide

and deliver dinner to him and other staffers working late on the transportation

appropriations bill.

3

e.    On or about July 24, 2003, Lobbyist C or Firm B provided and delivered lunch to ALBAUGH and other members of Representative 4's staff.

f.    On or about July 25, 2003, ALBAUGH accepted lunch for himself and other Congressional staffers provided and delivered by Lobbyist C or Firm B.

g.    On or about August 4, 2003, ALBAUGH accepted a meal provided by Lobbyist C or Firm B at Charlie Palmer's restaurant.

h.    On or about November 17, 2003, ALBAUGH accepted lunch at Oceanaire restaurant in Washington, DC provided by Lobbyist C or Firm B.

i.    On or about November 17, 2003, ALBAUGH solicited four tickets to each of three upcoming events:

   i.    November 20, 2003 professional horse show at Patriot Center in Fairfax, Virginia;

   ii.   November 24, 2003 concert by the children's group, The Wiggles in a suite at MCI Center; and,

   iii.  December 14, 2003 Washington Redskins football game in a FedEx Field Suite.

Each of these tickets was provided by Lobbyist C or Firm B.  ALBAUGH used his relationship with Lobbyist C to secure the horse show and Redskins tickets for himself, and to obtain the Wiggles tickets for another staffer of Representative 4.

j.    On or about November 24, 2003, ALBAUGH accepted five tickets provided by Lobbyist C or Firm B to a November 30, 2003 Washington Redskins football game in a suite at FedEx Field.

4

k.    On or about January 22, 2004, ALBAUGH solicited and accepted four tickets provided by Lobbyist C or Firm B to a performance of Disney on Ice in a suite at MCI Center, which he provided to another staffer for Representative 4.

10.    The approximate total value of the things ALBAUGH personally received from Lobbyist C, Firm B, or their clients during the conspiracy period was at least $4,000.

Campaign Funds and Fundraisers Benefitting Representative 4

11.    As part of the conspiracy described in paragraph 8, ALBAUGH solicited and/or accepted for the benefit of Representative 4 a number of campaign contributions, campaign fund raisers, or unreported in-kind contributions funded by Lobbyist C, Firm B, or their clients, including but not limited to the following:

a.    On or about January 29, 2003, ALBAUGH requested and Lobbyist C agreed that Lobbyist C and Firm B would host a $10,000 fundraising dinner for the benefit of Representative 4 the following week.

b.    On or about February 4, 2003, Lobbyist C organized and hosted a fundraising dinner at Signatures restaurant for the benefit of Representative 4.  The campaign committee of Representative 4 did not reimburse Lobbyist C, Firm B, or Signatures restaurant for the cost of this event, nor did it disclose such costs as an in-kind contribution in its required filings with the Federal Election Commission.

c.    On or about May 14, 2003, ALBAUGH solicited and Lobbyist C agreed to provide use of the MCI Center suite for a fundraising event benefitting Representative 4 during an upcoming American Idols concert tour event.

d.    On or about June 17, 2003, at the request of ALBAUGH, Abramoff provided

5

$5,000 to satisfy the initial funding obligation of a political action committee
established by Representative 4.

e.      On or about July 28, 2003, Lobbyist C complied with ALBAUGH's request that
he host a fundraising event for the benefit of Representative 4 during an American
Idols concert event in an MCI Center Suite. The campaign committee of
Representative 4 did not timely reimburse Lobbyist C or Firm B for the costs of
this event, nor did the campaign committee timely disclose any such costs in
required filings with the Federal Election Commission. ALBAUGH did not ask
Lobbyist C for the costs of this event until more than two years later, in reaction to
press attention related to the lobbying practices of Abramoff.

f.      On or about September 4, 2003, at the request of ALBAUGH, Lobbyist C and
Firm B hosted a fund raiser in a suite at FedEx Field for the benefit of
Representative 4 during the season-opening football game for the Washington
Redskins. The campaign committee of Representative 4 did not timely reimburse
Lobbyist C or Firm B for the costs of this event, nor did the campaign committee
timely disclose any such costs in required filings with the Federal Election
Commission. ALBAUGH did not ask Lobbyist C for the cost of this event, in
order to reimburse the cost of the event or report it in the campaign committee's
filings with the FEC until more than two years later, in reaction to press attention
scrutinizing the lobbying practices of Abramoff, nor did it disclose such costs as .

Official Acts

12.      As part of the conspiracy described in paragraph 8, ALBAUGH took and agreed to take a

6

stream of official action benefitting Lobbyist C, Firm B, and their clients.  The stream of official action included, but was not limited to, the following:

a.    On or about March 19, 2003, at the suggestion of ALBAUGH, Representative 4 called  Jack Abramoff, thanking him in advance for use of one of his FedEx Field suites for an upcoming fund raising event.  During that call, Representative 4 also asked Abramoff which particular projects Firm B's clients wanted in the transportation bill.  Abramoff thereafter sent an e-mail to the lobbyists on his team, including Lobbyist C, telling them that Representative 4 had "basically asked what we want in the transportation bill," and instructing them to "make sure we load up our entire Christmas list."

b.    On or about April 10, 2003, ALBAUGH agreed with Lobbyist C to meet with him to review Firm B's clients' transportation appropriation requests.

c.    On or about May 19, 2003, at the request of Lobbyist C, ALBAUGH agreed with Lobbyist C to preserve certain transportation appropriation requests benefitting various clients of Lobbyist C in a district in which the Member of Congress had announced he was retiring, despite the custom that these requests would normally have been eliminated.

d.    On or about July 2, 2003, Lobbyist C e-mailed ALBAUGH to ask him "[w]as (sic) our other [appropriations] requests easy to find?"  ALBAUGH responded, "[a]ren't you lucky I'm around," to which Lobbyist C responded, "[y]ou better believe it."

e.    On or about July 11, 2003, ALBAUGH agreed to ensure that clients of Lobbyist C

and Firm B received more than $ 4 million in a Subcommittee draft of the transportation appropriations bill.

f.    On or about July 29, 2003, ALBAUGH agreed with Lobbyist C to assist him with securing approximately $4.183 million in funding for a road project benefitting one of Lobbyist C's clients.  ALBAUGH, Representative 4, and Lobbyist C had discussed this request the night before in an MCI Center Suite during an American Idols concert event using tickets paid for by Lobbyist C, Firm B or their clients.

g.    On or about November 4, 2003, Lobbyist C e-mailed ALBAUGH, telling him, "[n]ow let's get that conference done so we can bring the bucks home!!!!!" ALBAUGH responded, "I (sic) actually going thru the earmarks right now!"

h.    On or about November 11, 2003, ALBAUGH e-mailed Lobbyist C to tell him that, "there will be something for [Client A].  About 1 million."

i.    On or about November 12, 2003, in response to an e-mail from Lobbyist C asking whether he is "still conferencing" on the transportation appropriations bill, ALBAUGH responded, "[y]es, it is helping your projects out."  Lobbyist C then responded, "WOO-HOO.  Tell me when you can. . . thanks."  ALBAUGH subsequently responded:

> "[Client A] is now at $1.25 m
>
> [Client B] $1 m
>
> [Client C] $1.2 m
>
> [Client D] $1.4 m
>
> Whos [sic] the man!"

j.     On or about March 5, 2004, Lobbyist C requested and ALBAUGH agreed to

insert a question prepared by Lobbyist C into the written record of a

Subcommittee hearing that would benefit one of Lobbyist C's clients that

ALBAUGH had assisted in November 2003.

Concealment of Things of Value Received

13.    ALBAUGH knowingly concealed material facts regarding his receipt of the stream of

things of value from Lobbyist C and others by, among other things, falsifying the

following form:

a.     On or about May 17, 2004, ALBAUGH signed and filed a required Financial

Disclosure Statement for Calendar Year 2003 with the Office of the Clerk, United

States House of Representatives.  ALBAUGH intentionally failed to disclose on

this form that he had received certain sporting event tickets, concert tickets, and

meals from Lobbyist C that individually and in the aggregate exceeded the

reporting thresholds.

Wire Communications

14.    On numerous occasions from in or about March 2002 through in or about May 2004,

ALBAUGH communicated with his coconspirators, including Lobbyist C, in furtherance

of the conspiracy using interstate electronic mail and interstate telephone calls.

*                    *                    *

The preceding statement is a summary, made for the purpose of providing the Court with

a factual basis for my guilty plea to the conspiracy charge against me.  It does not include all of

9

the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crime charged.

Date: _MAY 24, 2008_

JOHN CARLTON ALBAUGH

Jeffrey S. Jacobovitz, Esq.
Schiff Hardin LLP
Counsel for Defendant

10